## IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| BERNADETTE CLYBURN, | ) | |
| | ) | Case No. 21-cv-05251 |
| Plaintiff, | ) | |
| | ) | The Hon. Judge Matthew Kennelly |
| v. | ) | |
| | ) | |
| FORD MOTOR COMPANY, | ) | **JURY DEMANDED** |
| | ) | |
| Defendant. | ) | |

## FIRST AMENDED COMPLAINT

BERNADETTE CLYBURN ("Plaintiff" or "Clyburn"), by and through her undersigned counsel, Cass Thomas Casper, Esq., DISPARTI LAW GROUP, P.A., complains as follows against Defendant Ford Motor Company ("Defendant" or "Ford").

## JURISDICTION AND VENUE

1. Jurisdiction over the Plaintiff's federal law claims exists pursuant to 28 U.S.C. § 1331 as these claims involve federal questions under Title VII (42 U.S.C. § 2000e-5) and Section 1981 (42 U.S.C. §§ 1981 and 1981(a)).

2. Supplemental jurisdiction exists over the state law claims pursuant to 28 U.S.C. § 1367 because the state law count is so related to the other claims in this action as to form part of the same case or controversy.

3. This Court has jurisdiction over the Parties and the subject matter.

4. Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391(b) because the events and omissions giving rise to the claims herein have occurred, in whole or in part, in this judicial district.

5. Venue is also proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because

Defendant does business here by operating at least three (3) plants, including the Chicago Assembly Plant.

## PARTIES

6.   Plaintiff Clyburn is a legal adult and, at the time of the filing of this First Amended Complaint, a resident of Indiana. At relevant times, Plaintiff has held the job classification of classified driver with Defendant.

7.   Defendant Ford Motor Company operates at least two facilities in the Chicagoland area, including the Chicago Assembly Plant at 12600 South Torrence Avenue in Chicago, Illinois, and the Ford Stamping Plant located at 1000 East Lincoln Highway in Chicago Heights, Illinois.

## ADMINISTRATIVE PREREQUISITES

8.   Plaintiff, as alleged herein, suffered a pattern of unlawful harassment and discrimination Substantially-similar to the other Plaintiffs in *Van v. Ford Motor Company*, 14-cv-08708 ("*Van*"), of which Plaintiff was a co-Plaintiff until her claims were severed leading to the instant case.

9.   Plaintiff brought suit alongside the other *Van* plaintiffs pursuant to the single-filer or "piggyback" exception to the EEOC-exhaustion requirement.

10. Because at least 24 other female employees filed EEOC charges alleging similar acts of hostile-work-environment-based gender discrimination, during the same time period as Plaintiff focuses her claims here, and because none of those cases led to resolution before the EEOC, Plaintiff properly exhausted her administrative remedies as a matter of the "single-filer" or "piggyback" doctrine.

11. Too, Plaintiff has properly-exhausted her administrative remedies as a matter of the

piggyback doctrine because Ford was on notice of the other claims and did not resolve any of those claims at the EEOC level to Plaintiff's knowledge; hence, pursuing EEOC remedies would also have been futile as it led to no resolutions in the other cases.

12. Plaintiff has properly exhausted her administrative remedies and this case is properly before this Court.

## FORD IS A RECIDIVIST OFFENDER AS TO EEO LAWS

13. Prior to the complaint filed in *Van*, at least nine other people had sued Ford for sexual harassment, sex discrimination, race discrimination, assault, and/or battery in *Rivera v. Ford Motor Company*, 95-cv-2990, a case filed in this judicial district.

14. Another 14 women filed suit against Ford in *Warnell v. Ford Motor Company*, 98-cv-1503, in this judicial district.

15. Ford was previously subjected to workplace monitoring by the EEOC and a reasonable cause determination that sexual harassment occurred and was occurring in its Chicago-area manufacturing facilities based upon allegations of supervisors making degrading references to women and female genitalia, grabbing, touching, and groping of female workers, sexist graffiti, and the presence of pornographic material in the workplace.

16. Despite this prior track record, Ford continues to allow a sexually hostile work environment to persist in its Chicago-area plants, leading to *Van* and the instant lawsuit.

## COUNT 1 – GENDER DISCRIMINATION AND HOSTILE WORK ENVIRONMENT SEXUAL HARASSMENT IN VIOLATION OF TITLE VII (FEMALE)
(Plaintiff v. Defendant Ford Motor Company)

17. Plaintiff adopts, realleges and incorporates by reference the allegations contained in Paragraphs One through Sixteen of this First Amended Complaint as if fully restated herein.

18. Plaintiff has suffered sexual harassment in at least the following ways, either personally

3

and/or by working in an environment permeated by such actions of which she was aware:

    a.  Unwanted and unwelcome sexual advances;

    b.  Unwelcome and unwanted touching;

    c.  Requests for sexual favors;

    d.  Stories of sexual conquests, desires, or escapades;

    e.  Comments about the female anatomy;

    f.  Comments about individual womens' specific body parts;

    g.  Comments about what a male would like to do to a particular female sexually;

    h.  Comments of a sexually suggestive nature;

    i.  Name-calling, to include, but not limited to, comments directed to women such as "bitch," "ho," "slut," "whore," "dike," "good pussy," and other similarly degrading terms;

    j.  Graffiti and pornographic images;

    k.  Pictures of genitalia and/or of a sexual nature;

    l.  On at least one occasion, a sex toy was brought into the workplace and sent around via photogrpah;

    m.  Lurid, foul and offensive language; and,

    n.  Other conduct of a sexually inappropriate nature for the workplace.

19. For example, the sex toy was brought into the workplace and placed on a staircase, and then pictures of it were sent around to Ford employees, many of whom laughed at the following picture:



20. Plaintiff additionally states that she was aware of sexual batteries and unwelcome, unwanted touchings occurring in the workplace, including, but not limited to, the following:

   a.   Supervisors groping, touching, caressing, hugging, and/or attempting to kiss women in the workplace;

   b.   Supervisors forcibly attempting sexual acts on women in the workplace;

   c.   Supervisors staring at female workers in sexual ways and staring at female workers' breasts and buttocks;

   d.   Supervisors intentionally pushing their genital areas up against female workers'

backsides in an effort at "dry-humping;"

  e. Supervisors belittling women by calling them names, referring to them as "fresh meat," and verbally treating women as sex objects;

  f. Video recordings of at least one woman being made and circulated among staff at Ford depicting a female co-worker engaging in humiliating sexual acts on a salaried staff person. Plaintiff was shown a picture of the video during working hours in the plant depicting the co-worker lying in the supervisor's bed.

21. Clyburn states that she was specifically subjected to the following actions:

  a. Sexual stares;

  b. Male co-workers discussing their penis sizes in her presence.

  c. A male co-worker told her, words to the effect, that he had "all of ten inches waiting for her pleasure" and, after a female reported much the same statement was made to her, Plaintiff confronted the supervisor who iterated that "Well, you know, you can get some, too."

  d. She personally witnessed male supervisors stand behind female co-workers and stare at their buttocks.

  e. Plaintiff overheard male supervisors brag about their sexual conquests with female employees.

  f. Plaintiff experienced other degrading comments, such as "I'd like to get all up in that," and "black bitch," or words to that effect, from male colleagues.

  g. Plaintiff was specifically aware of the sex toy having been brought into the plant and was offended by it.

  h. The placement of a camera in a women's bathroom when cameras were not present in any other bathrooms of which Plaintiff is aware.

6

       i.   While temporarily working on C-Crew in the Chicago Assembly Plant, Clyburn was subjected to a discussion between male employees regarding which female workers will perform sex acts for money.

       j.   Plaintiff was personally subjected to, and observed other women being subjected to, sexual gawking by male supervisors in the plant that occurred all the time throughout the plant.

       k.   On one occasion Plaintiff was physically elbowed by a female supervisor who was constantly micromanaging and nitpicking Plaintiff because she was aware of Plaintiff's complaints to management about harassment and discrimination.

       l.   On another occasion, Plaintiff was walking through the Trim Department and a male walking behind her stated to her "damn, you've got a big ass."

       m.  Plaintiff was also told on another occasion words to the effect, "Damn, baby, it is hot in here and so are you."

       n.  Another supervisor, Joe Johnson, would constantly make comments about Plaintiff's figure, comparing Plaintiff's figure to his niece's, and commenting, words to the effect, "You got a cute figure, like my niece. Y'all both got big butts."

       o.   Joe Johnson on one occasion stood over Plaintiff, very close to her, and told her while she was sitting at a desk that "I got something that'll drop your man like an elephant," in threatening fashion to Plaintiff about her then-boyfriend.

       p.   On another occasion, when Plaintiff complained about sexual harassment, Superintendent Miller assaulted Plaintiff, poked her in the chest with his finger, and threatened violence against her.

22. Plaintiff was aware of numerous offensive graffiti images of penises, a magazine

prominently displayed at a work-station depicting a naked female on the cover, pornographic photographs of naked women at a supervisor's workstation, and a degrading T-shirt referring to women as "Bitch Niggaz" and stating "a Bitch will Fuck anybody Fo job security."

23. The sexual harassment and conduct of a sexual nature were severe or pervasive, altered the terms and conditions of Plaintiff's employment and subjected Plaintiff to a hostile work environment based upon her gender (female).

24. Plaintiff reported the foregoing and other acts of sexual harassment by calling the sexual harassment telephone hotline, making reports to labor relations, and/or reporting the conduct to her supervisors and to her union.

25. For example, Plaintiff discussed her specific sexual harassment, discrimination, and retaliation issues with Ford's Labor Relations Representatives and staff, to include, but not limited to, Natalie Dahrenger, Catina McCoy, Aaron Wynne, Teresa Geuyser, Anita O'Connor, Bonnie Wiersma, Terrance McClain, and a supervisor named Craig Miller. None of Plaintiff conversations about sexual harassment she experienced with these individuals led to any changes whatsoever in Plaintiff's work environment.

26. Between about 2013 and 2016, for example, Plaintiff complained to Ford's Labor Relations about at least the following individuals engaging in sexually harassing, discriminatory, and/or retaliatory conduct: Joe Johnson, Melinda Miller, Zack Bozanic, Kim Wyatt, Allyssa Millard.

27. Plaintiff's complaints to the aforementioned individuals went without changes to her working conditions, and the reporting process was futile and led to no changes.

28. For example, Plaintiff heard that one of the Human Resources Representatives to

whom she complained had bragged to co-workers about having a sexual relationship with one of the individuals about whom Plaintiff complained.

29. Plaintiff also became aware that one of the union committeemen had been in a relationship with a supervisor at the plant, which undermined the union as a meaningful mechanism to challenge harassment and discrimination, even if such allegations were redressable by the union (which they were not redressable by the union, in any event).

30. With respect to other complaints Plaintiff made, she would give statements to Labor Relations Representatives only to have nothing occur whatsoever to follow up on such complaint.

31. Too, Plaintiff was told by at least one Labor Relations Representative, Aaron Wynn, not to call the sexual harassment hotline.

32. Other Labor Relations Representatives to whom Plaintiff complained treated her complaints with nonchalance and without seriousness, and none of these complaints ever led to any findings or changes.

33. Plaintiff also complained about race-based harassment, including on numerous occasions about supervisors referring to Plaintiff and other black women as "black bitch." Plaintiff complained about this conduct to at least Supervisor Janie Little, who told Plaintiff not to complaint to Labor Relations about such conduct because Plaintiff would suffer retaliation if she did.

34. While Ford did initiate sexual harassment training, it was used as an opportunity to threaten and intimidate women from reporting sexually-harassing conduct. For example, on one occasion, Plaintiff attended a sexual harassment training only to be told by the instructor that employees who complaint about sexual harassment are subject to termination if, in the sole

opinion of Labor Relations, the employee's complaint was not credible. The same instructor advised that complaints of sexual harassment would be considered false claims, unless accompanied by clear proof, which included that multiple witnesses would be needed.

35. During the sexual harassment training, the instructor further stated that Ford would not tolerate employees speaking out against the company publicly, and was adamant and repetitive on the point that falsely complaining of sexual harassment was a serious offense. The instructor also stated that salaried supervisors who stare at women from behind were not staring at womens' bodies, but merely watching women work.

36. During the same sexual harassment training, the instructor asked the question, "Besides pleasure, what are women's breasts good for?," which greatly offended Plaintiff.

37. The sexual harassment training was directly contrary to Ford's purported anti-sexual harassment policy, and was used as a means of watering-down the policy and intimidating women such as Plaintiff into foregoing filing complaints.

38. Despite Plaintiff's actions in reporting the sexually harassing conduct alleged herein, such conduct did not cease, and such conduct continued to the same extent it always had.

39. After Plaintiff reported the activities, she experienced retaliatory actions, such as penises being drawn in employee break areas, totems in her work area resembling penises, and the circulation of a t-shirt containing retaliatory and degrading language about women who complain.

40. At no time did Ford take prompt remedial action to stop the discriminatory and harassing acts toward the Plaintiff.

41. As a direct and proximate cause of the foregoing sexual harassment, Plaintiff has been

damaged at least in that she has lost time from work, has suffered anxiety, depression, humiliation, psychological injury, and emotional distress.

42. Plaintiff's damages include psychological injury for which she has sought psychological treatment and therapy.

43. As a direct and proximate cause of the foregoing sexual harassment, Plaintiff has suffered sexual harassment within the meaning of Title VII.

WHEREFORE, for the foregoing reasons, Plaintiff respectfully requests that this Court enter judgment in her favor, and against Defendant, and enter and order all available relief, including compensatory damages in an amount up to $300,000, lost pay and benefits, and injunctive and declaratory relief. Plaintiff additional requests that this Court enter an award of reasonable attorneys' fees and costs, and such other relief as this Court deems just and proper.

## COUNT 2 – RETALIATION IN VIOLATION OF TITLE VII
(Plaintiff v. Defendant Ford Motor Company)

44. Plaintiff adopts, realleges and incorporates by reference the allegations contained in Paragraphs One through Forty-Three of this First Amended Complaint as if fully restated herein.

45. Plaintiff has engaged in numerous instances of Title VII protected activity, including reporting sexual harassment, discrimination, and retaliation to Ford via its sexual harassment hotline, to her supervisors, to her union, and to Labor Relations, as well as giving evidence in the *Van* proceedings and being a Plaintiff in that case.

46. Plaintiff has suffered retaliation in violation of Title VII in at least the following ways:

a.   Trish Dillingham has repeatedly denied weekend overtime to Plaintiff and to her husband, Ray Oller, while allowing a classified driver, Wayne Birchfield, to work such overtime. To Plaintiff's knowledge, Mr. Birchfield has not filed and pursued harassment and

11

discrimination complaints as Plaintiff has. When Plainitff complained about this disparate overtime to Fred Jones, he advised Plaintiff that she should get the same overtime as Birchfield.

b. Trish Dillingham, in response to Plaintiff's complaint, threatened to separate Plaintiff from working with her husband, Ray Oller. Dillingham also maintained Plaintiff at her husband at 10 hours per day pay during weekdays, while others were paid at 11 hours per day for no reason other than retaliation.

c. Plaintiff and her husband were subsequently moved to the NorthPoint facility after her complaints about Dillingham, where she was notified she would work indefinitely. Plaintiff and her husband were later moved back to CAP, again displacing them.

d. Plaintiff was deprived of overtime on numerous occasions for having complained, and such overtime was given, instead, to "non-defiant" employees.

e. Plaintiff was made aware on numerous occasions of degrading graffiti, including graffiti stating words to the effect of "Ford hoes lying" and "Ford hoes lying for fame on tv."

f. Joe Johnson on one occasion stood over Plaintiff, very close to her, and told her while she was sitting at a desk that "I got something that'll drop your man like an elephant," in threatening fashion to Plaintiff about her then-boyfriend.

g. On one occasion Plaintiff was physically elbowed by a female supervisor who was constantly micromanaging and nitpicking Plaintiff because she was aware of Plaintiff's complaints to management about harassment and discrimination.

h. Plaintiff repeatedly experienced work under Supervisor Chuck Nennert (white), Zach Bozanick (white), and Alissa Millard (white) where they would permit white employees to take longer breaks than her and other African-American employees.

i. When Plaintiff complained about this treatment, Bozanick and Millard accused

Plaintiff of being defiant and subjected her to closer scrutiny than white employees, and also subjected her to unequal distribution of overtime as a result of her complaints.

     j.   Plaintiff was referred to as "black bitch" and "bitch nigger" as a result of her protected reporting conduct.

     k.   Plaintiff's complaints, in some instances, were publicized, either on individual basis to supervisors she was complaining about, or verbally to others, causing more acrimony, belittling, and micromaging/nitpicking behavior from Plaintiff's supervisors to Plaintiff.

     l.   On another occasion, when Plaintiff complained about sexual harassment, Superintendent Miller assaulted Plaintiff, poked her in the chest with his finger, and threatened violence against her.

     m.   Superintendent Miller subjects Plaintiff to increased performance scrutiny and unfair discipline, and demanded that lower level supervisors write her up and micromanage her in a way that was not done with co-workers who had not complained about discrimination/harassment.

   47. Like her sexual harassment complaints, Plaintiff also repeatedly reported retaliatory conduct to Labor Relations, but was met with the same inaction and nonchalance as occurred with her sexual harassment complaints.

   48. At no time did Ford take prompt remedial action to stop retaliatory acts toward the Plaintiff.

   49. As a direct and proximate cause of the foregoing retaliation, Plaintiff has been damaged at least in that she has lost time from work, has suffered anxiety, depression, humiliation, psychological injury, and emotional distress.

   50. Plaintiff's damages include psychological injury for which she has sought psychological

treatment and therapy.

51. As a direct and proximate cause of the foregoing acts, Plaintiff has suffered

retaliation within the meaning of Title VII.

WHEREFORE, for the foregoing reasons, Plaintiff respectfully requests that this Court

enter judgment in her favor, and against Defendant, and enter and order all available relief,

including compensatory damages in an amount up to $300,000, lost pay and benefits, and

injunctive and declaratory relief. Plaintiff additional requests that this Court enter an award of

reasonable attorneys' fees and costs, and such other relief as this Court deems just and proper.

## COUNT 3 – RACE DISCRIMINATION UNDER 42 U.S.C. § 1981
(Plaintiff v. Defendant Ford Motor Company)

52. Plaintiff adopts, realleges and incorporates by reference the allegations contained in

Paragraphs One through Fifty-One of this First Amended Complaint as if fully restated herein.

53. This is a claim made under 42 U.S.C. § 1981.

54. Plaintiff is a member of a racial minority (African-American).

55. Defendant's treatment of Plaintiff has denied her full and equal benefit of all laws for the

security of persons and property as is enjoyed by white citizens in violation of 42 U.S.C. § 1981.

56. Plaintiff has been forced to work under supervisors who have been reported to be racist

or have racist attitudes .

57. Plaintiff has been forced to work in a racially hostile work environment that provided

white employees more favorable treatment and terms and conditions of employment. For

example:

a. Plaintiff repeatedly experienced work under Supervisor Chuck Nennert (white),

Zach Bozanick (white), and Alissa Millard (white) where they would permit white employees to

take longer breaks than her and other African-American employees.

14

b.   When Plaintiff complained about this treatment, Bozanick and Millard accused Plaintiff of being defiant and subjected her to closer scrutiny than white employees, and also subjected her to unequal distribution of overtime as a result of her complaints.

c.   Plaintiff received less overtime than non-complaining white and black employees as a result of her complaints.

d.   Plaintiff and other black females have been repeatedly and frequently referred to as "black bitch," without it being redressed by management despite Plaintiff's complaints about it.

e.   Plaintiff was called "nigger" by white supervisors on numerous occasions, including by Zach Bozanick and Alyssa Millard.

f.   Plaintiff heard Chuck Nennert refer to black women as "nigger" and "those niggers."

g.   Plaintiff and other black females have been referred to as "bitch niggaz."

h.   Plaintiff and her husband were offered and volunteered for overtime, only to have the offer retracted after she appeared to work for it on the grounds that they were not on the list.

58. The foregoing actions were taken against Plaintiff intentionally.

59. As a result of the foregoing conduct, Plaintiff has been denied equal rights and equal enjoyment of the benefits, privileges, terms and conditions of employment as white employees.

60. As a direct and proximate cause of the foregoing discrimination, Plaintiff has been damaged at least in that she has lost time from work, has suffered anxiety, depression, humiliation, psychological injury, and emotional distress.

WHEREFORE, for the foregoing reasons, Plaintiff respectfully requests that this Court enter judgment in her favor, and against Defendant, and enter and order all available relief,

including compensatory damages in an amount to be determined at trial, lost pay and benefits, and injunctive and declaratory relief. Plaintiff additional requests that this Court enter an award of reasonable attorneys' fees and costs, and such other relief as this Court deems just and proper.

## COUNT 4 – RACE DISCRIMINATION AND HOSTILE WORK ENVIRONMENT RACIAL HARASSMENT IN VIOLATION OF TITLE VII (BLACK)
(Plaintiff v. Defendant Ford Motor Company)

61. Plaintiff adopts, realleges and incorporates by reference the allegations contained in Paragraphs One through Sixty of this First Amended Complaint as if fully restated herein.

62. Plaintiff is a member of a racial minority (African-American).

63. During Plaintiff's tenure at Ford, she has been forced to work under supervisors who have been reported to be racist or have racist attitudes .

64. Plaintiff has been forced to work in a racially hostile work environment that provided white employees more favorable treatment and terms and conditions of employment. For example:

    a. Plaintiff repeatedly experienced work under Supervisor Chuck Nennert (white), Zach Bozanick (white), and Alissa Millard (white) where they would permit white employees to take longer breaks than her and other African-American employees.

    b. When Plaintiff complained about this treatment, Bozanick and Millard accused Plaintiff of being defiant and subjected her to closer scrutiny than white employees, and also subjected her to unequal distribution of overtime as a result of her complaints.

    c. Plaintiff received less overtime than non-complaining white and black employees as a result of her complaints.

    d. Plaintiff and other black females have been repeatedly and frequently referred to

as "black bitch," without it being redressed by management despite Plaintiff's complaints about it.

   e.   Plaintiff was called "nigger" by white supervisors on numerous occasions, including by Zach Bozanick and Alyssa Millard.

   f.   Plaintiff heard Chuck Nennert refer to black women as "nigger" and "those niggers."

   g.   Plaintiff and other black females have been referred to as "bitch niggaz."

   h.   Plaintiff and her husband were offered and volunteered for overtime, only to have the offer retracted after she appeared to work for it on the grounds that they were not on the list.

65. The foregoing actions were taken against Plaintiff intentionally.

66. As a result of the foregoing conduct, Plaintiff has been denied equal rights and equal enjoyment of the benefits, privileges, terms and conditions of employment as white employees.

67. As a direct and proximate cause of the foregoing discrimination, Plaintiff has been damaged at least in that she has lost time from work, has suffered anxiety, depression, humiliation, psychological injury, and emotional distress.

   WHEREFORE, for the foregoing reasons, Plaintiff respectfully requests that this Court enter judgment in her favor, and against Defendant, and enter and order all available relief, including compensatory damages up to $300,000, lost pay and benefits, and injunctive and declaratory relief. Plaintiff additional requests that this Court enter an award of reasonable attorneys' fees and costs, and such other relief as this Court deems just and proper.

### COUNT 5 - ASSAULT
(Plaintiff v. Defendant Ford Motor Company via respondeat superior)

68. Plaintiff adopts, realleges and incorporates by reference the allegations contained in Paragraphs One through Sixty-Seven of this First Amended Complaint as if fully restated herein.

69. The acts alleged herein were performed intentionally.

70. For example, the following assaults occurred on Plaintiff in the course of her employment:

a.   Miller poked Plaintiff in the chest with his finger, and threatened violence against her.

b.   Plaintiff was physically elbowed by Miller, who was constantly micromanaging and nitpicking Plaintiff because she was aware of Plaintiff's complaints to management about harassment and discrimination.

c.   Joe Johnson on one occasion stood over Plaintiff, very close to her, and told her while she was sitting at a desk that "I got something that'll drop your man like an elephant," in threatening fashion to Plaintiff about her then-boyfriend.

71. Defendant's acts placed Plaintiff in fear/reasonable apprehension of an immediate battery or harmful or physical touching.

72. At all times, Miller and Johnson were acting the scope and course of their employment with Ford as Plaintiff's supervisors, and used the color of their supervisory status to commit the aforementioned fear of batteries and actual batteries upon Plaintiff.

73. Defendant took no steps to prevent Plaintiff from being assaulted.

74. As a direct and proximate cause of the Defendants' agents conduct, the Plaintiff suffered damages.

75. Defendant Ford is liable for the tortious acts and assaults of its agents/supervisors, Johnson and Miller alleged herein.

WHEREFORE, for the foregoing reasons, Plaintiff respectfully requests that this Court enter judgment in her favor, and against Defendant, and enter and order all available relief,

including compensatory damages in the amount of $100,000 per incident of assault. Plaintiff additional requests that this Court enter an award of costs, and such other relief as this Court deems just and proper.

## COUNT 6 - BATTERY
(Plaintiff v. Defendant Ford Motor Company via respondeat superior)

76. Plaintiff adopts, realleges and incorporates by reference the allegations contained in Paragraphs One through Seventy-Five of this First Amended Complaint as if fully restated herein.

77. The acts alleged herein were performed intentionally.

78. For example, the following batteries occurred on Plaintiff in the course of her employment:

      a.   Miller poked Plaintiff in the chest with his finger, and threatened violence against her.

      b.   Plaintiff was physically elbowed by Miller, who was constantly micromanaging and nitpicking Plaintiff because she was aware of Plaintiff's complaints to management about harassment and discrimination.

      c.   Joe Johnson on one occasion stood over Plaintiff, very close to her, and told her while she was sitting at a desk that "I got something that'll drop your man like an elephant," in threatening fashion to Plaintiff about her then-boyfriend.

79. Defendant's acts constituted unprivileged, non-sensual physical touchings upon Plaintiff.

80. At all times, Miller and Johnson were acting the scope and course of their employment with Ford as Plaintiff's supervisors, and used the color of their supervisory status to commit the aforementioned actual batteries upon Plaintiff.

81. Defendant took no steps to prevent Plaintiff from being battered.

82. As a direct and proximate cause of the Defendants' agents conduct, the Plaintiff suffered damages.

83. Defendant Ford is liable for the tortious acts and assaults of its agents/supervisors, Johnson and Miller alleged herein.

WHEREFORE, for the foregoing reasons, Plaintiff respectfully requests that this Court enter judgment in her favor, and against Defendant, and enter and order all available relief, including compensatory damages in the amount of $100,000 per incident of battery. Plaintiff additional requests that this Court enter an award of costs, and such other relief as this Court deems just and proper.

**JURY DEMANDED ON ALL COUNTS**

Respectfully submitted,

**BERNADETTE CLYBURN**

*/s/ Cass T. Casper*
By:_____
                Cass T. Casper, Esq.
                Her Attorney

*Cass T. Casper, Esq.*
DISPARTI LAW GROUP, P.A.
121 W. Wacker Drive, Suite 2300
Chicago, Illinois 60601
P: (312) 506-5511 ext. 331
F: (312) 846-6363
E: ccasper@dispartilaw.com

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on November 29, 2021, he caused to be served the foregoing First Amended Complaint on all counsel of record via this Court's CM/ECF filing system, and that all such counsels are registered e-filers.

*/s/ Cass T. Casper*

_____